

## COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-11-00180-CV

IN THE INTEREST OF S.S.A.,
A CHILD

----------

FROM THE 431ST DISTRICT COURT OF DENTON COUNTY

----------

### MEMORANDUM OPINION[1]

----------

### I. INTRODUCTION

Appellant Frank[2] appeals the trial court's order terminating the parent-child relationship between S.S.A. and himself. In six issues, Frank challenges the legal and factual sufficiency of the evidence supporting each of the grounds the trial court found for termination under Texas Family Code section 161.001(1).[3]

---

[1]*See* Tex. R. App. P. 47.4.

[2]Because this case involves the termination of parental rights to a minor, we use aliases or initials to describe the parties. *See* Tex. R. App. P. 9.8.

[3]*See* Tex. Fam. Code Ann. § 161.001(1) (West Supp. 2011).

He also challenges the legal and factually sufficiency of the evidence supporting the trial court's finding that termination of his parental rights regarding S.S.A. was in her best interest.[4]  We will affirm.

## II. BACKGROUND

This case originated in an alleged sexual assault of S.S.A.  The alleged assailant was the roommate of S.S.A.'s biological mother, Kim, with whom S.S.A. lived in Denton, Texas.  The ensuing investigation involved the Texas Department of Family and Protective Services (CPS or Department) seeking the termination of Frank's and Kim's parental rights to S.S.A.

When the termination proceedings began in November of 2009, S.S.A. was four years old, and CPS had not yet located Frank.  Due to travel issues, Kim, who had now moved to East Texas with a boyfriend, was also not at the initial hearing.[5]  She was, however, represented by counsel.  At that time, CPS asked that S.S.A. be temporarily placed with her maternal aunt and that the trial court order an expedited home study of S.S.A.'s maternal grandfather, who lives in Florida, so that she might be placed with him.  S.S.A. had lived with him for several months when she was a baby.  The trial court granted CPS's requests.

---

[4]*See* Tex. Fam. Code Ann. § 161.001(2) (West Supp. 2011).

[5]The record is replete with evidence that Kim would move frequently, usually coinciding with her having a new boyfriend.

2

The trial court held a status hearing in June 2010.[6] At the hearing, CPS revealed that it had finally contacted Frank—located in an Iowa prison. After receiving notification of CPS's intention to seek termination of his paternal rights to S.S.A., Frank answered by sending a letter to CPS seeking paternity testing and the appointment of counsel. The trial court ordered paternity testing.

At the time of an August 5, 2009 permanency hearing, Kim had also been incarcerated in Iowa and S.S.A. had been placed with "her grandmother." CPS asked for S.S.A. to remain there, pending the scheduled paternity testing. The trial court held another permanency hearing on November 22, 2010. At that hearing, the trial court approved S.S.A.'s placement with her maternal grandfather.

On March 17, 2011, the trial court held another permanency hearing. Frank, now represented by counsel, was still incarcerated in Iowa. Although Kim had been released from incarceration in the fall of 2010, she had not returned to Texas and was not at the hearing. A CPS investigator testified that tests confirmed Frank as S.S.A.'s biological father. Frank's attorney explained that although he had initially spoken with Frank on the phone, Frank had since been moved to a different Iowa penal facility, and that he had since had difficulty contacting Frank. The trial court ordered that S.S.A. remain with her maternal grandfather.

---

[6]There is evidence in the record that hearings other than those mentioned in this opinion were also held in conjunction with this termination suit.

The trial court held the termination trial on May 2, 2011. Kim's attorney testified that despite some contact with Kim earlier in the proceedings, and Kim's request to attend the termination trial, Kim had not responded to recent notifications of the trial date and Kim had also not responded to repeated attempts to contact her through her attorney. Frank's court-appointed attorney stated that he had recently spoken with Frank and that he wanted to attend the trial, but that due to his incarceration in Iowa, Frank was unable to attend the hearing.[7] Due to the absence of both parents, Kim's attorney moved to withdraw Kim's earlier request for a jury trial, and all parties agreed to proceed with a trial before the bench instead.

Nerrissa Bryant, a CPS investigator, testified. According to Bryant, CPS received a referral regarding S.S.A., concerning an allegation of a possible sexual assault of S.S.A. by Kim's then roommate. Bryant gathered information about the alleged assault and also investigated S.S.A.'s familial setting. During her investigation, Bryant learned of Frank. By Bryant's account, Kim informed her that Frank was in Iowa, but that she was unsure of his exact location. Kim also relayed to Bryant that Frank was aware that he was S.S.A.'s father. Kim conveyed to Bryant that Frank was unhappy about her having become pregnant

---

[7]There is no evidence that Frank requested to participate in the trial through other means such as affidavit or telephonic participation. *See In re D.D.J.*, 136 S.W.3d 305, 313–14 (Tex. App.—Fort Worth 2004, no pet.) (reasoning that an inmate who is not allowed to participate in a family matter lawsuit due to incarceration should be allowed to "*proceed by affidavit, deposition, telephone, or other effective means*").

4

and that they later broke off their relationship. Bryant said that Kim told her that Frank had never paid any child support and had never had any contact with S.S.A. Bryant also said that, according to Kim, Frank did once try to set up a visit with S.S.A. when she was roughly one year old, but that the visit never happened. Bryant also testified that S.S.A. shared the last name of another of Kim's friends, who was neither Frank nor the person she lived with when allegations of sexual abused were raised.

Because Kim had previously tested positive for marijuana on an earlier CPS referral regarding S.S.A. and because of her behavior during an interview, Bryant called for drug testing. Kim tested positive for methamphetamines. Furthermore, Bryant said that CPS gathered evidence that Kim had sexually assaulted S.S.A. and that, primarily because of drug use, had neglected S.S.A.

Bryant said that her investigation revealed that Kim had two other children, that she had been investigated before in Iowa regarding the two children, and that although she did not believe that the two children were in Kim's "care and custody," she found no evidence that they had been removed by that state's child protective services. Bryant said that her investigation only revealed the name of Frank but no other information. She was unable to locate Frank. Bryant also explained S.S.A.'s current living status. At the time of trial, S.S.A. lived with her maternal grandfather. CPS believed that S.S.A. should remain there.

Former CPS conservatorship caseworker Kayla Gulling also testified at trial. Gulling was responsible for developing temporary orders pending this case.

5

Gulling said that because Kim had missed numerous court appearances and visitations with S.S.A., Gulling had only met Kim once, at a hearing, to which Kim was transported from the Denton jail that she might attend.[8]  It was at this hearing that Kim gave further information to Gulling which aided CPS in locating Frank.  After locating Frank, Gulling took Kim, who remained in a Denton jail, a picture of Frank, and Kim confirmed that the picture was S.S.A.'s biological father, Frank.  After this, Gulling sent Frank a letter explaining that CPS had an open case regarding S.S.A. and that he was her alleged biological father.

Frank responded with a letter stating that he did not know of the existence of S.S.A., that he questioned whether he was S.S.A.'s father, and that he would like DNA testing to confirm his potential paternity.  Gulling also stated that because Frank was frequently incarcerated, he had never had any contact with S.S.A., and that his incarceration limited his ability to be a parent to S.S.A. Based on this evidence, CPS also made the decision to seek termination of his parental rights.

S.S.A.'s aunt, whom she had been placed with temporarily earlier in the pendency of this case, also testified at trial.  Aunt testified that she had known S.S.A. her entire life and that she first knew of Kim's pregnancy with S.S.A. when Kim traveled to Mississippi from Iowa with a man the family believed to be S.S.A.'s father.  She testified that Kim had told her Frank's first name.  Aunt said

---

[8]This appears to be a permanency hearing where no reporter's record was transcribed.

6

that although she had heard that Kim told Frank of her pregnancy with S.S.A., that information was secondhand.

Aunt said that since S.S.A.'s birth, both she and S.S.A.'s maternal grandfather frequently visited S.S.A. Aunt testified that S.S.A. had been placed with her when Kim was investigated under a 2007 CPS referral. Aunt said that she was aware of Kim's drug use after the first CPS investigation regarding S.S.A. According to Aunt, S.S.A. lived with either the maternal grandfather's friend, herself, or S.S.A.'s maternal grandfather during the initial CPS investigation. Aunt testified that after CPS returned S.S.A. to Kim the first time, Kim lost weight, began to be paranoid, and "was broken out . . . her face had scabs and scars." By Aunt's account, Kim's physical condition had deteriorated to such a degree that "[Aunt] had a hard time recognizing her." Aunt also testified that S.S.A.'s health deteriorated at the same time. Aunt recalled that when she would pick up S.S.A. for visits, S.S.A. would become hysterical when she realized they were returning home to Kim's.

Aunt testified that she believed S.S.A.'s maternal grandfather's house was the proper permanent place for S.S.A. Aunt said that the maternal grandfather provided a stable home with a stable relationship—he has been married to Aunt's sister for more than twenty-five years. Aunt testified that she believed it in S.S.A.'s best interest that Kim's parental rights be terminated due in large part to Kim's "constantly [bringing different] men in and out of her life, . . . so many I could probably, you know, list them off on two hands."

7

S.S.A.'s maternal grandfather also testified at trial. He said that Kim had been in foster homes most of her life, but that at one point she was placed in an Iowa "halfway house when she was around [seventeen]." The grandfather said that Kim escaped from that facility with a person whom he understood was S.S.A.'s biological father. After a few moves and a displacement from Mississippi caused by Hurricane Katrina, Kim lived with grandfather for a short time. S.S.A. was born shortly thereafter. When S.S.A. was between nine and fifteen months old, grandfather recalled Kim having multiple conversations with Frank on the phone. One such call revolved around Kim asking Frank for financial support of S.S.A. and for him to "step up and take responsibility." He said that she specifically told Frank he was S.S.A.'s father. Grandfather said he had no doubt that Frank was aware that he was S.S.A.'s biological father and that these phone calls occurred prior to Frank's current incarceration.

Grandfather said that Kim previously had two children removed from her custody in Iowa. He also testified that S.S.A. had stayed with him during both CPS investigations. In fact, grandfather testified that he spent as much time with S.S.A. as he could since she was born: "We used to try to pick her up on the weekends and take her out to our house whenever we could."

Grandfather said that when S.S.A. first began living with him this most recent time, she suffered from numerous health issues, including upper respiratory infections. He opined that these infections were caused in part from the constant moving and living in motels: "[T]hey lived in motels most of the time,

8

so they smoked a lot, never opened the doors, so she was constantly at the ER." Grandfather said that since she had lived with him, S.S.A.'s health had improved dramatically, and he was able to pay for an MRI himself prior to a recent eye surgery that S.S.A. had needed since she was born and had been suggested at two years old. Grandfather said that he and his wife, who also have a fourteen-year-old daughter, were ready and willing to adopt S.S.A. and provide her with a stable home.

Lori Powell, a CASA representative, also testified. According to Powell, S.S.A. was nearly five and one-half years old at the time of trial. Powell testified that CPS's home study of the maternal grandfather's placement revealed a "very positive" placement. Powell said that the grandfather "clearly [has] the ability to provide a safe and stable environment" for S.S.A. Powell also said that CASA recommended that the trial court appoint grandfather permanent managing conservator of S.S.A., and that the grandfather wished to adopt S.S.A.

Powell testified that permanency was "[a]bsolutely, critical" in a child's life. She recommended terminating Kim's parental rights because S.S.A. had lacked important elements in her life like "physical support, financial support, and her emotional needs." Powell also said that CASA recommended terminating Frank's rights because "[Frank] hasn't had a relationship with [S.S.A.], and that he is incarcerated and could be as far into as 2012." She also said that Frank had never provided any kind of support for S.S.A.—physical, financial, or emotional. Powell said that based on the testimony at trial, she believed that

9

Frank was aware of Kim's pregnancy with S.S.A. And Powell also said that Frank demonstrated a lack of interest in S.S.A.'s well-being by not attempting to correspond with CPS about S.S.A.'s placement or how she was being provided for, even after confirming his paternity through testing. But Powell also testified that Frank's request in his initial letter to the trial court for information regarding the status of charges against S.S.A.'s alleged assailant in this latest referral and for S.S.A.'s medical records did show "some concern" regarding S.S.A.'s well-being.

Rachel Phillips, a CPS conservatorship worker, testified that she also had worked S.S.A.'s current referral, which led to CPS's pursing termination of Kim's and Frank's paternal rights and placement of S.S.A. with the maternal grandfather. Phillips said that frequent visits to the maternal grandfather's house since S.S.A.'s placement there have revealed that "[S.S.A.] [is] doing well. She's had eye surgery recently, and it went well." Phillips said that the maternal grandfather wished to adopt S.S.A.

Phillips testified that she had no doubt that Frank knew of Kim's pregnancy with S.S.A. She also said that Frank knew of the criminal and drug-prevalent environment that S.S.A. lived in when S.S.A. lived with Kim. Phillips averred that Frank had not provided CPS with any family or kinship possibilities, that he was not a placement option, nor was he able to provide S.S.A. with a safe environment due to his incarceration, and that she believed Frank had constructively abandoned S.S.A. She also testified that Frank had knowingly

10

engaged in the criminal activity that he knew could lead to incarceration after he had knowledge of S.S.A. Phillips said that Frank had demonstrated an inability to care for S.S.A. and, despite evidence that Kim had sought financial support from Frank for the care of S.S.A., he had never paid child support. Ultimately, Phillips stated that

> The department feels that [Frank] has known that [S.S.A.] was his child. If not known, maybe that there was a great possibility that she was and that he engaged in criminal activities at that time that led to his incarceration and him not being able to care for her now. And so the department feels it's in her best interest to have permanency, and we feel that she can have that with [her maternal grandfather].

After closing arguments, and relative to Frank, the trial court said that it was specifically finding by clear and convincing evidence that Frank "learned at some point prior to his current incarceration that he was likely or alleged to be the father of [S.S.A.]." The trial court also found that Frank had taken "no steps to support [S.S.A.], to become a part of [S.S.A.'s] life, to determine [for sure] whether or not he was, in fact, [S.S.A.'s] father, or do anything else in relation to [S.S.A.]." The trial court also stated that Frank's correspondence with the court since learning of the termination suit demonstrated a "relatively shallow concern" for S.S.A. The trial court found that Frank had knowingly placed or allowed S.S.A. to remain in conditions that endangered her physical and emotional well-being; that Frank had engaged in conduct or knowingly placed S.S.A. with persons who engaged in conduct which endangered her physical and emotional well-being; and that Frank had knowingly engaged in criminal conduct that has

11

resulted in his conviction of an offense and confinement or imprisonment and inability to care for S.S.A. for not less than two years from the date CPS filed this termination petition. The trial court also found termination of Frank's paternal rights in S.S.A.'s best interest. Based on these findings, the trial court terminated Frank's paternal rights to S.S.A. This appeal followed.[9]

## III. DISCUSSION

### A. Frank Knew of S.S.A. Prior to Paternity Testing

In part of all of Frank's six issues,[10] he challenges the legal and factual sufficiency of the evidence to support the trial court's finding that he knew that he was S.S.A.'s biological father.[11] The Department responds that the trial court's finding that Frank knew of S.S.A. prior to his incarceration is supported legally and factually by the record. We agree with the Department.

---

[9]The trial court also ordered that Kim's paternal rights to S.S.A. be terminated. Kim did not file an appeal.

[10]Frank's issues on appeal track the issues raised in his motion for new trial and in his statement of points, both filed fourteen days after the trial court entered its order to terminate Frank's parental rights. *See* Tex. Fam. Code Ann. § 263.405(b) (West Supp. 2011), *amended by* Act of May 19, 2011, 82d Leg., R.S., ch. 75, § 4, 2011 Tex. Gen. Laws 348, 349–50 (no longer requiring a party seeking appellate review to have filed a statement of points with trial court).

[11]In part of his briefing, Frank asserts that "[t]he testimony from all witnesses indicates that [Frank] was unaware of his being the father of S.S.A. until the results of the paternity test were made known." This is simply false. The trial court specifically found that Frank was aware of his paternity to S.S.A. prior to his most recent incarceration and prior to the court-ordered paternity testing. Moreover, multiple witnesses testified to Frank's knowledge of his paternity and that Frank knew of S.S.A. prior to his most recent incarceration.

12

### 1. Burden of Proof

A parent's rights to "the companionship, care, custody, and management" of his children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (West 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20–21; *In re M.C.T.*, 250 S.W.3d 161, 167 (Tex. App.—Fort Worth 2008, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001 (West Supp. 2011); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the factfinder. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. §§ 161.001, 206(a) (West 2008). Evidence is

clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (West 2008). Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification).

### B.   Legal Sufficiency Standard of Review

In reviewing the evidence for legal sufficiency in parental termination cases, we must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We must review all the evidence in the light most favorable to the finding and judgment. *Id.* This means that we must assume that the factfinder resolved any disputed facts in favor of its finding if a reasonable factfinder could have done so. *Id.* We must also disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We must consider, however, undisputed evidence even if it is contrary to the finding. *Id.* That is, we must consider evidence favorable to termination if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *Id.*

We must therefore consider all of the evidence, not just that which favors the verdict. *Id.* But we cannot weigh witness credibility issues that depend on

14

the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573, 574. And even when credibility issues appear in the appellate record, we must defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

## C. Factual Sufficiency Standard of Review

In reviewing the evidence for factual sufficiency, we must give due deference to the factfinder's findings and not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We must determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated the applicable subsection to 161.001 and that the termination of the parent-child relationship is in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

## D. Frank's Knowledge of His Paternity

Viewing the entire record in light most favorable to the trial court's judgment, the record reveals that Frank was aware of S.S.A. prior to her being fifteen months old. S.S.A.'s grandfather testified that Kim discussed S.S.A. with Frank on multiple occasions when S.S.A. lived with the grandfather between the ages of nine months and fifteen months old. Furthermore, multiple Department

15

representatives and one CASA representative all testified that Frank knew of his paternity to S.S.A. prior to his current incarceration. There was also testimony that Frank had someone inquire about S.S.A., prior to her being a year old.

Frank's response is that the record does not demonstrate his affirmative knowledge of paternity until after the paternity test confirmed he was S.S.A.'s biological father less than seven months prior to the termination trial. This court also notes that there was testimony that at one time Kim may have believed a man other than Frank was S.S.A.'s father. After carefully reviewing the entire record and viewing all of the evidence in the light most favorable to the finding and judgment, we hold that the evidence is such that a factfinder could reasonably form a firm belief or conviction that Frank knew of his paternity to S.S.A. before she was fifteen months old; thus, Frank knew of S.S.A. prior to the conduct that led to his incarceration in 2009. *See* Tex. Fam. Code Ann. § 161.001(1)(Q). Accordingly, we hold that the evidence is legally and factually sufficient to support the trial court's finding regarding Frank's knowledge of his paternity.

### E. The Trial Court's Section 160.001(1)(Q) Finding

In part of his fourth issue, Frank contends that the evidence is legally and factually insufficient to support the trial court's finding that he knowingly engaged in criminal conduct that resulted in his conviction for an offense and confinement resulting in his inability to care for S.S.A. for not less than two years from the date of the filing of the petition. Specifically, Frank argues that there is no

16

evidence in the record of "the length of [Frank's] incarceration and its end date." We disagree.

Subsection 161.001(1)(Q) warrants termination of parental rights when a parent knowingly engaged in criminal conduct, resulting in the parent's conviction of an offense, and the parent is both incarcerated and unable to care for the child for at least two years from the date the termination petition was filed. Tex. Fam. Code Ann. § 161.001(1)(Q). This court and other Texas appellate courts have construed section 161.001(1)(Q) as requiring a three-step process. *See In re E.S.S.*, 131 S.W.3d 632, 639 (Tex. App.—Fort Worth 2004, no pet.); *see also In re Caballero*, 53 S.W.3d 391, 395 (Tex. App.—Amarillo 2001, pet. denied). First, the party seeking termination must establish that the parent's knowing criminal conduct resulted in incarceration for more than two years. *E.S.S.*, 131 S.W.3d at 639–40. Second, the parent must produce some evidence as to how he would provide or arrange to provide care for the child during that period. *Id.* Finally, the party seeking termination would then have the burden of persuasion that the arrangement would not satisfy the parent's duty to the child. *Id.*

In part of this issue, Frank contends that the trial court abused its discretion by admitting certain evidence, over his hearsay objections, depicting the date Frank was incarcerated and his expected release date. Frank contends that without these admitted documents—exhibits 4, 9, and 10—the evidence is insufficient to prove a release date satisfying section 160.001(1)(Q)'s requirement that he has the inability to care for S.S.A. for not less than two years

17

from the date of the filing of the petition to terminate his parental rights. Tex. Fam. Code Ann. § 161.001(1)(Q).

Assuming without deciding that the trial court should not have admitted the challenged evidence, we cannot conclude on this record that Frank was harmed by their admission. *See* Tex. R. App. P. 44.1(a)(1) (stating that reversal occurs only when an error "probably caused the rendition of an improper judgment."). As the Department points out, the trial court took judicial notice of the court's file. In the court's file, there exist multiple documents reflecting Frank's expected release date from his current incarceration in February 2012. There is also ample evidence in the record supporting the trial court's finding that Frank knew of his paternity to S.S.A. prior to his current conviction that led to his incarceration and that it is expected he would remain there for two years from the filing of the petition seeking termination. Indeed, the evidence demonstrates that CPS sought termination in November 2009 and that Frank was scheduled to remain incarcerated until February 2012. We hold that, even assuming the complained-of evidence should not have been admitted, the record contains sufficient evidence to support the trial court's findings as to the first element of a 161.001(1)(Q) finding; namely, that Frank knowingly committed criminal conduct resulting in his incarceration for more than two years from the petition's filing. *See E.S.S.*, 131 S.W.3d at 639–40.

Furthermore, Frank bore the burden of demonstrating how he would provide or arrange to provide care for S.S.A. during his incarceration. *Id.* The

18

record, however, demonstrates that Frank never provided CPS with any family or kinship possibilities for S.S.A.'s placement during his incarceration. Frank also did not supply the trial court with any testimony, through affidavit or other means, of how he intended to provide this support. Thus, Frank failed to carry his burden demonstrating that he could provide for S.S.A. during his incarceration. *See id.* Finally, because Frank failed to carry his burden, the Department was relieved of carrying its burden of persuasion that Frank's offered care provisions were satisfactory. *See Caballero*, 53 S.W.3d at 396 (holding that petitioner carries no burden of persuasion under 161.001(1)(Q)'s care element when parent fails to provide some evidence of provisional care for child during incarceration). We overrule Frank's fourth issue.

**F.    Best Interest of S.S.A.**

In his fifth issue, Frank contends that the evidence is legally and factually insufficient to support the trial court's ruling that termination of the parent-child relationship between Frank and S.S.A. is in S.S.A.'s best interest.

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West 2008). The following factors should be considered in evaluating the parent's willingness and ability to provide the child with a safe environment:

(1)    the child's age and physical and mental vulnerabilities;

19

(2)     the frequency and nature of out-of-home placements;

(3)     the magnitude, frequency, and circumstances of the harm to the child;

(4)     whether the child has been the victim of repeated harm after the initial report and intervention by the department or other agency;

(5)     whether the child is fearful of living in or returning to the child's home;

(6)     the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home;

(7)     whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;

(8)     whether there is a history of substance abuse by the child's family or others who have access to the child's home;

(9)     whether the perpetrator of the harm to the child is identified;

(10)   the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(11)   the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

(12)   whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with:

        (A)     minimally adequate health and nutritional care;

        (B)     care, nurturance, and appropriate discipline consistent with the child's physical and psychological development;

        (C)     guidance and supervision consistent with the child's safety;

20

(D)     a safe physical home environment;

(E)     protection from repeated exposure to violence even though the violence may not be directed at the child; and

(F)     an understanding of the child's needs and capabilities; and

(13)   whether an adequate social support system consisting of an extended family and friends is available to the child.

*Id.* § 263.307(b); *R.R.*, 209 S.W.3d at 116.

Other, nonexclusive factors that the factfinder in a termination case may use in determining the best interest of the child include: (A) the desires of the child; (B) the emotional and physical needs of the child now and in the future; (C) the emotional and physical danger to the child now and in the future; (D) the parental abilities of the individuals seeking custody; (E) the programs available to assist these individuals to promote the best interest of the child; (F) the plans for the child by these individuals or by the agency seeking custody; (G) the stability of the home or proposed placement; (H) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (I) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that

termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

Here, regarding S.S.A.'s age and physical and mental vulnerabilities, the record demonstrates that S.S.A. was nearly five and one-half years old at the time of trial. The record demonstrates that prior to her current placement with her maternal grandfather, S.S.A.'s health had deteriorated and she was frequently in the emergency room due to poor care and exposure to frequent moves and smoke inhalation. The record demonstrates that at best, Frank simply did not take any action to aid S.S.A. regarding her physical or mental vulnerabilities, or at worse, his complicity allowed S.S.A. to live in an environment of drug abuse and crime.

The record also demonstrates that prior to placement, S.S.A. was delayed in receiving care for a congenital eye condition. Since moving in with her grandfather, S.S.A. has received the surgery she needed, and her health has improved dramatically.

Pertaining to the frequency and nature of out-of-home placements, S.S.A. has already lived portions of her young life with a family friend, her grandmother, her aunt on two occasions, her maternal grandfather on two occasions, and her mother, who frequently moved and lived with a revolving door of boyfriends. Frank has never been a part of S.S.A.'s life, and despite his knowledge of her existence, never afforded any effort to assist her living conditions or otherwise

provide a stable and safe environment for her to grow up in. In contrast, S.S.A.'s maternal grandfather, who wishes to adopt S.S.A., has been one of the most stable people in her life. In addition to living with him during multiple CPS referrals regarding Kim, the grandfather has also committed himself to visiting S.S.A. as frequently as possible since her birth. Reports indicated positive reviews of her placement in her grandfather's home. The maternal grandfather also wishes to adopt S.S.A., giving her a permanency in living conditions that she has lacked her entire life.

The record is simply void of any evidence regarding the willingness and ability of Frank to seek out, accept, and complete counseling services in conjunction with CPS pertaining to S.S.A. Even assuming he was unaware of S.S.A. until the paternity test, the trial court specifically found that his actions since the paternity test have demonstrated a "relatively shallow concern" for S.S.A. On the flip side, S.S.A.'s maternal grandfather has shown a willingness to cooperate with CPS, including having a home study performed, and he has allowed the agency's close supervision of his relationship with S.S.A.

The record further demonstrates that Frank has never provided any type of care for S.S.A, including not providing health or nutritional care, or any other type of care geared at providing S.S.A. with the proper physical and psychological development she needs. In contrast, the maternal grandfather has provided food, shelter, financial support for an MRI, surgery and other health care needs, and, perhaps most important, the grandfather has provided S.S.A. with a safe

23

physical home environment that includes a social support system consisting of his wife, his fourteen-year-old daughter, and his sister-in-law, S.S.A.'s aunt, who is also heavily involved in S.S.A.'s life. Frank, on the other hand, through his acts of crime and omission of care in S.S.A.'s life, has indicated that the existing parent-child relationship between himself and S.S.A. is not a proper one. Indeed, the record indicates that Frank has spent the majority of his life in and out of prison, and other than an indication in the record that he intends to attend drug counseling during his current incarceration, Frank did not explain to the trial court any willingness to take steps necessary to become a better father to S.S.A.

In summary, viewing the evidence in the light most favorable to the trial court's best interest finding, we conclude and hold that the evidence produced at trial was sufficient to produce in the mind of the trial court a firm belief or conviction as to the truth of the allegation that termination of Frank's paternal rights to S.S.A. was in her best interest. We overrule Frank's fifth issue. Having overruled portions of Frank's six issues, and having overruled his fourth and fifth issues in their entirety, we need not address the remaining portions of Frank's issues pertaining to the trial court's other findings under 161.001. *See In re M.N.G.*, 147 S.W.3d 521, 540 n.9 (Tex. App.—Fort Worth 2004, pet. denied) (op. on reh'g).

24

## IV. CONCLUSION

Having overruled Frank's fourth, fifth, and portions of all six of his issues which are dispositive, we affirm the trial court's order terminating his parental rights to S.S.A.

                                        BILL MEIER
                                        JUSTICE

PANEL:  DAUPHINOT, MEIER, and GABRIEL, JJ.

DAUPHINOT, J., concurs without opinion.

DELIVERED:  July 19, 2012